UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

THURMAN G. and JENNIFER G.,
as parents, guardians, and next friends of
L.G., a minor individual with a
disability,

      Plaintiffs,

v.

No. 1:19-CV-102-H

SWEETWATER INDEPENDENT
SCHOOL DISTRICT,

      Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING SWEETWATER'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This case stems from a disagreement between the parents of L.G., a student with learning disabilities, and Sweetwater Independent School District regarding the district's placement of L.G. in non-special-education classes. L.G.'s parents filed an action with the Texas Education Agency (TEA) alleging that Sweetwater denied L.G. a free appropriate public education (FAPE) and requesting various forms of relief. Dkt. No. 9-2 at 48. After a Special Education Hearing Officer (SEHO) denied their requests for relief, the parents filed this civil action asking the Court to find that the SEHO erred and grant relief in their favor. Dkt. No. 1. Before the Court are the parties' cross motions for summary judgment. Dkt. Nos. 23, 32. The plaintiffs request judgment in their favor because the SEHO erred when she excluded the report and testimony of their expert, found that Sweetwater did not deny L.G. a FAPE, and declined to grant relief. Dkt. Nos. 32, 33. In contrast, Sweetwater requests judgment in its favor because, in its view, the SEHO did not err. Dkt. Nos. 23, 24.

As explained below, the Court grants Sweetwater's motion and denies the plaintiffs' motion.[1]

Upon review of the applicable law and the evidence, the Court finds that the SEHO did not commit error in any of the ways alleged by the plaintiffs.  Considering that the Texas Rules of Civil Procedure apply to due-process hearings in front of the TEA and that the plaintiffs violated the rules by failing to disclose the identity of their expert or the expert's report until six days before trial, the Court finds that the SEHO did not abuse her discretion and err by excluding the expert testimony and report.  Additionally, because the plaintiffs have failed to meet their burden of showing, by a preponderance of the evidence, that Sweetwater procedurally or substantively denied L.G. a FAPE, the Court finds that the SEHO did not err when she found that Sweetwater did not deny L.G. a FAPE.  As a result of these findings, the Court further finds that the SEHO did not err when she denied the plaintiffs' requests for relief.  Accordingly, the Court grants Sweetwater's Motion for Summary Judgment, Dkt. No. 23, and denies the plaintiffs' Amended Motion for Summary Judgment, Dkt. No. 32.

## 1.    Factual and Procedural Background

### A.    The IDEA

Congress passed the Individuals with Disabilities Education Act (IDEA)[2] "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs

---

[1] The plaintiffs filed two motions for summary judgment before the Court—an original motion for summary judgment, Dkt. No. 26, and an amended motion for summary judgment, Dkt. No. 32. Because the plaintiffs filed an amended motion for summary judgment, the Court denies the original motion for summary judgment as moot and considers only the amended motion.

[2] For the reader's convenience, the Court includes a glossary of defined terms at the end of this order.

and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA requires school districts in states receiving designated federal funds to provide "[a] free appropriate public education . . . to all children with disabilities residing in the State." § 1412(a)(1)(A). Additionally, the state and the school districts must "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]." § 1415(a). "To ensure that a child receives a FAPE, parents and school districts collaborate to develop an Individualized Education Plan ("IEP") that is reasonably calculated to enable the child to receive educational benefits." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (internal quotations omitted).

In Texas, an Admissions, Review, and Dismissal Committee (ARDC) develops the IEP. *Id.* The ARDC is composed of a group of individuals, including: (1) the disabled child's parents; (2) at least one of the disabled child's regular-education teachers; (3) at least one of the disabled child's special-education teachers; (4) a representative of the school district; (5) an individual who can interpret the instructional implications of evaluation results; (6) at the discretion of the parents or the district, other individuals who have knowledge or special expertise regarding the child; and (7) if appropriate, the child. § 1414(d)(1)(B).

Under the IDEA, any party has an opportunity to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the [disabled] child, or the provision of a free appropriate public education to such child." § 1415(b)(6)(A).

> Whenever a complaint has been received[,] . . . the parents or the local educational agency involved in such complaint shall have an opportunity for

an impartial due process hearing, which shall be conducted by the State
educational agency or by the local educational agency, as determined by State
law or by the State educational agency.

§ 1415(f)(1)(A). In Texas, "[t]he Texas Education Agency (TEA) . . . maintain[s] a pool of

impartial hearing officers to conduct due process hearings." Tex. Admin. Code

§ 89.1170(a).

"Any party aggrieved by the findings [made at a due-process hearing,] . . . shall have

the right to bring a civil action with respect to the complaint presented . . . ." 20 U.S.C.

§ 1415(i)(2)(A). Such an action "may be brought . . . in a district court of the United States,

without regard to the amount in controversy." *Id.*

### B.     Factual Background

During the 2013–14 school year, L.G. began attending J.P. Cowen Elementary as a

pre-kindergarten student. Dkt. No. 9-4 at 109. During that year, L.G. exhibited signs of a

speech impairment. *See id.* at 16. As a result, L.G. received a Full Individual Evaluation

(FIE), which found that she had a "possible speech/language delay" and was eligible for

special education. *Id.* at 14, 21. Accordingly, in August of 2014, L.G. started receiving

speech services from Sweetwater Independent School District. Dkt. No. 31-5 at 23.

In August 2015, L.G. began attending kindergarten at Southeast Elementary. Dkt.

No. 9-4 at 186. During that year, L.G. struggled in reading and writing. *Id.* at 165; Dkt.

No. 31-5 at 212. As a result, L.G.'s parents requested that L.G.'s ARDC meet to discuss

her progress in the classroom. Dkt. No. 9-4 at 227. The ARDC convened on May 9, 2016.

*Id.* In that meeting, school personnel recommended that L.G. repeat kindergarten, and the

committee referred L.G. for an FIE. *Id.*

In accordance with the school officials' recommendation, L.G. repeated kindergarten during the 2016–17 school year. *Id* at 245. And an FIE was completed on October 17, 2016. *Id.* at 26–42. The FIE considered various sources of data including: an Adaptive Behavior Assessment that was completed by both L.G.'s parents and her teacher, a Development Profile-3 assessment completed by both the parents and a teacher, a Wechsler Individual Achievement Test, assessments and observations by a speech-language pathologist, a vision and hearing screening, teacher information, classroom-observation data, and a home language survey. *Id.* at 26. Sweetwater did not conduct any occupational therapy (OT) evaluations or functional behavioral assessments (FBA) for the FIE. Dkt. No. 9-4 at 26.

The FIE indicated that L.G. had deficits in listening comprehension, early reading skills, math problem solving, alphabet writing fluency, numerical operations, oral expression, and spelling. Dkt. No. 31-4 at 7. Additionally, the FIE noted that L.G.'s teacher opined that she exhibited average gross-motor coordination but displayed below average fine-motor coordination. *Id.* at 1. And the FIE recommended that L.G. needed special education as a student with an intellectual disability and a speech/language impairment. Dkt. No. 9-4 at 39.

After completion of the FIE, the ARDC met again, on October 24, 2016, to update L.G.'s IEP. *Id.* at 245. The ARDC reviewed L.G.'s present levels of academic achievement and functional performance (PLAAFP)—a portion of the IEP that describes the student's levels of performance at that time. *Id.* The PLAAFP included an analysis of L.G.'s levels of achievement in reading, speech, written expression, math, behavior, and functioning. *Id.* The PLAAFP noted that: (1) L.G. was performing at a pre-kindergarten level in reading and

math; (2) her speech difficulties adversely impacted her ability to access information in the general-education setting; (3) she was on level in written expression; (4) L.G. was easily distracted but could be redirected with instruction; and (5) she generally can function in her educational environment but has difficulty with two- and three-step instructions.  *Id.*

Additionally, at the ARDC meeting, school personnel confirmed that L.G. would be promoted to first grade for the 2017–18 school year.  *Id.* at 246.  L.G.'s schedule of services was updated to include 315 minutes of general education per day, 80 minutes per day of special education in reading and math, and two approximately 30-minute speech-therapy sessions per week.  *Id.* at 250.  And the ARDC created academic goals for L.G. in speech, language arts and reading, and math.  *Id.* at 254–55.

The ARDC convened again in January 2017.  Dkt. No. 9-5 at 2.  It did not change L.G.'s PLAAFP.  *See* Dkt. No. 9-4 at 245; Dkt. No. 9-5 at 3.  But the ARDC updated her goals and included goals for speech, functioning, language arts and reading, and math.  Dkt. No. 9-5 at 6–8.  The services that Sweetwater provided L.G. remained the same, including speech therapy and special education for reading and math.  *Id.* at 14.  Additionally, the ARDC concluded that L.G. required accommodations in all academic areas including instructional aids, small-group instruction, visual aids, study aids/manipulatives, exemption from reading before peers, extra time to complete assignments, grading based on participation/social skills acquisition, and multiple-choice questions.  *Id.* at 9.

In May 2017, L.G. took an Istation reading assessment, which recorded her as performing at the grade equivalent of a fifth-month kindergartner.  Dkt. No. 31-3 at 47.  In September 2017, L.G. took a math STAR test, where she ranked in the tenth percentile as

compared to her peers nationally.  Dkt. No. 31-1 at 104.  And in October 2017, L.G. took a reading STAR, which indicated that she was unable to read any grade-level text.  *Id.* at 103.

In October 2017, L.G. received her first progress report after being in first grade. Dkt. No. 9-5 at 108–109.  The report showed that L.G. made progress toward achieving her goals.  *Id.*  And another report issued in November 2017 indicated that L.G. had further progressed toward achieving her goals.  *Id.* at 110–11.

In December 2017, the ARDC convened for its annual review for L.G.'s IEP.  *Id.* at 46.  The ARDC updated L.G.'s PLAAFP to reflect her progress.  *Id.* at 47.  In particular, the reading PLAAFP was updated to reflect that L.G. had scored at the grade equivalent of a second-month kindergartner on her STAR assessment.  *Id.*  The committee also updated L.G.'s goals.  *Id.* at 50–53.  With respect to services, the ARDC concluded that L.G. needed speech therapy in a small-group setting weekly.  *Id.* at 60.  The ARDC also concluded that for the remainder of first grade, L.G. should receive special education in math and reading, and that for second grade, L.G. should receive special education for language arts, math, and reading.  *Id.*  After this meeting, Sweetwater issued a Prior Written Notice (PWN) outlining that the meeting was the annual ARDC was held to review the annual progress as required by law.  *Id.* at 65.

After the December 2017 ARDC meeting, L.G.'s progress reports again indicated progress toward her goals.  L.G. mastered her functional, language arts, and reading goals. *Id.* at 112–13.  And L.G. progressed toward achieving the goals created during the December ARDC meeting.  *See id.* at 115, 117; Dkt. No. 31-2 at 119.  Additionally, in the spring of 2018, L.G. earned passing grades in her science and social-studies classes, which were completed in the general-education classroom.  Dkt. No. 31-1 at 51.

L.G.'s STAR assessments in the spring of 2018 also indicated educational progress, but her Istation assessments did not.  L.G. took STAR reading and math assessments in January and May 2018, and L.G. scored higher on both May assessments.  *See* Dkt. No. 9-5 at 89–92.  Additionally, the STAR reading assessment indicated that L.G. was a transitional reader.  *Id.* at 89.  In contrast, on her Istation assessments, L.G.'s scores in most areas actually decreased, indicating that L.G. performed at the level of a second-month kindergartner.  *Id.* at 84–87.

In August 2018, L.G.'s parents called an ARDC meeting.  *Id.* at 71.  At the meeting, the parents requested an Independent Educational Evaluation (IEE) that included cognitive and achievement evaluations, an OT evaluation, and an FBA.  *Id.* at 72.  Additionally, the parents raised concerns pertaining to the mainstreaming[3] of L.G. in science and social studies and requested that L.G. receive instruction for those classes in a special-education environment.  *Id.*  Sweetwater ARDC members expressed concern over removing L.G. from her mainstreamed science and social-studies classes.  *Id.*  It also offered to conduct a new FIE, but L.G.'s parents denied.  *Id.*  Bullying was listed as a concern on the meeting agenda, but neither Sweetwater nor L.G.'s parents raised the issue.  *See id.* at 72, 119.

After the August 2018 ARDC meeting, Sweetwater issued a PWN declining to move L.G. to a special-education environment for science and social studies.  *Id.* at 76.  L.G. subsequently started second grade at a new school.  *Id.* at 71.

In September 2018, the ARDC convened again, and L.G.'s parents stated that they had L.G. evaluated at a Sylvan Learning Center and that the results indicated that L.G. was

---

[3] Mainstreaming, as used by the parties in their briefing and by the Court in this order, means placing a student in non-special-needs classes.

three years behind her grade level.  *Id.* at 132–33.  L.G.'s parents also requested an IEE

again.  *Id.*  After this meeting, Sweetwater granted the request for the IEE that included

cognitive and achievement evaluations.  *Id.* at 136.  But Sweetwater denied the request for

an IEE that included an OT evaluation and an FBA on the basis that it had not conducted

its own OT evaluation or FBA and had no data to indicate such evaluations were needed.

*Id.*  Sweetwater did not file a due-process complaint after denying the request for IEE

evaluations beyond the scope of previous evaluations.  Dkt. No. 31-5 at 65.  Additionally,

when L.G.'s parents were looking for an IEE evaluator, Sweetwater required L.G.'s parents

to find an evaluator that met its IEE criteria.  Dkt. No. 31-2 at 104.  The parents ultimately

selected an evaluator who met Sweetwater's criteria, and Sweetwater engaged that

evaluator.  *Id.* at 113.

After the September meeting, L.G.'s parents requested private tutoring for L.G. and

that their expenses related to their attendance of the ARDC meeting be reimbursed.  *Id.* at

84.  Sweetwater denied both requests.  *Id.* at 85.

In October 2018, the IEE evaluator met with L.G.  Dkt. No. 31 at 223.  The

evaluator did not recommend instruction only in special-education classrooms.  Instead, she

recommended education in a functional classroom environment that concentrates on

obtaining basic educational skills and life skills.  *Id.* at 227.

On October 31, 2018, the plaintiffs  filed a request for a due-process hearing with the

TEA.  Dkt. No. 9-2 at 48.  The plaintiffs included several requests for relief, including a

finding that Sweetwater denied L.G. a FAPE, an order for Sweetwater to fund an IEE in all

areas of disability and need, an order for the ARDC to convene and develop a new IEP, an

order for Sweetwater to fund compensatory services, and an order for Sweetwater to reimburse costs incurred. *Id.* at 64–65.

While the plaintiffs' request for a due-process hearing was pending, the ARDC convened again in November 2018 for its annual review. Dkt. No. 9-5 at 154. At the meeting, the ARDC updated L.G.'s PLAAFP. *Id.* at 155–56. Additionally, the ARDC concluded that L.G. should continue attending speech therapy weekly and receiving instruction for math, reading, and language arts in the special-education classroom. *Id.* at 168–69.

As they prepared for the due-process hearing, the plaintiffs had L.G. evaluated by Dr. Roger Russell. Dkt. No. 9-2 at 286. On the day that Dr. Russell met with L.G., the plaintiffs declined to disclose Dr. Russell as an expert in their response to Sweetwater's request for production. Dkt. No. 31 at 37–38. Additionally, the plaintiffs admit that they did not supplement their discovery responses and inform Sweetwater that they intended to admit the report and testimony of Dr. Russell until six days before the due-process hearing was scheduled to start. *See* Dkt. No. 33 at 21. Sweetwater filed a motion to exclude Dr. Russell's report and testimony, which the SEHO granted. Dkt. No. 9-2 at 316. After an in-person due-process hearing, *id.* at 7, the SEHO denied all of the plaintiffs' requests for relief, *id.* at 46.

## C.    Procedural History

After the SEHO ruled in favor of Sweetwater, *id.* at 46, the plaintiffs brought this civil action pursuant to 20 U.S.C. § 1415, requesting the Court to annul the SEHO's decision, find that Sweetwater denied L.G. a FAPE, issue an order directing relief or remanding the matter to the SEHO for further fact finding, and award costs. Dkt. No. 1. In

their complaint, the plaintiffs alleged three errors in the SEHO's decision: (1) the SEHO erred in excluding Dr. Russell's report and testimony; (2) the SEHO erred in finding that Sweetwater substantively and procedurally provided L.G. with a FAPE; and (3) the SEHO erred in denying the relief sought by the plaintiffs.  *Id.* at 6.

The plaintiffs and Sweetwater filed cross motions for summary judgment requesting the Court to enter judgment in their favor.  Dkt. Nos. 23, 26.  The plaintiffs later filed an amended motion for summary judgment, Dkt. No. 32, which the Court considers in place of the plaintiffs' original motion.  The plaintiffs' amended motion requests that the Court make findings and rule in their favor as to the three grounds of error asserted in their complaint.  *See* Dkt. No. 27.  Sweetwater's motion requests the Court to find that the SEHO did not err and rule in its favor.  *See* Dkt. No. 33.  Sweetwater filed its response to the plaintiffs' amended motion, Dkt. No. 36, and the plaintiffs filed their response to Sweetwater's motion, Dkt. Nos. 35.  Subsequently, the plaintiffs filed a reply to Sweetwater's response, Dkt. No. 38, and Sweetwater filed a reply to the plaintiffs' response, Dkt. No. 39.  Accordingly, the parties' motions for summary judgment have been fully briefed and are ripe for review.

## 2.   Legal Standards

### A.   District-Court Review of Special Education Hearing-Officer Decisions

When a party brings a civil action challenging the decision of the hearing officer at a due-process hearing, "the court[:] (1) shall receive the records of the administrative proceedings; (2) shall hear additional evidence at the request of the party; and (3) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  "Congress left the choice of educational policies and methods where it properly belongs—in the hands of state and local

school officials." *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir.

2003). Therefore, "[t]he role of the judiciary is not to second-guess the decisions of school

officials or to substitute their plans for the education of disabled students with the court's."

*R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th Cir. 2010). "Instead, the court's role

is limited to determining whether those officials have complied with the IDEA." *Id.*

"In an IDEA case, [w]hen neither party has requested that the district court hear

additional evidence . . . there is nothing new presented only to the district court[.]" *Rockwall*

*Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 337 n.4 (5th Cir. 2016) (internal quotations omitted).

In such a situation, "[t]he motion for summary judgment is simply the procedural vehicle

for asking the judge to decide the case on the basis of the administrative record." *Id.*

(internal quotations omitted). Thus, in contrast to traditional summary-judgment motions,

summary-judgment motions in IDEA cases requesting the judge to decide the case on the

basis of the administrative record require courts to do more than decide whether there is a

genuine issue of material fact—courts must evaluate the evidence, make findings of fact,

and resolve the case. *See id.* at 337–38.

"The IDEA creates a presumption in favor of a school district's educational plan,

placing the burden of proof, by preponderance of the evidence, on the party challenging it."

*Id.* "The district court, reviewing the decision of a hearing officer under the IDEA, accords

'due weight' to the hearing officer's findings but ultimately reaches 'an independent decision

based upon the preponderance of the evidence' that is 'virtually de novo.'" *Id.*

"Accordingly, in IDEA proceedings, summary judgment 'is not directed to discerning

whether there are disputed issues of fact, but rather, whether the administrative record,

together with any additional evidence, establishes that there has been compliance with

IDEA's processes and that the child's educational needs have been appropriately addressed.'" *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016).

Courts review "evidentiary rulings under the abuse of discretion standard." *E.R. v. Spring branch Indep. Sch. Dist.*, 909 F.3d 754, 763 (5th Cir. 2018).  An abuse of discretion with respect to evidentiary rulings will justify overturning a hearing officer's decision only if "the challenged ruling affects a substantial right of a party."  *See id.*

**3.    Analysis**

**A.    The SEHO did not abuse her discretion when she excluded the plaintiffs' expert witness.**

Texas Rules of Civil Procedure 193.5 and 193.6, which require parties to supplement their expert-witness designations, apply in TEA proceedings, and the evidence indicates that the plaintiffs did not supplement their expert-witness designations as required by the rules. The IDEA states that "the parents or the local educational agency . . . shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."  20 U.S.C. § 1415(f)(1)(A).  Texas has adopted procedures for due-process hearings as required by Section 1415(f)(1)(A).  *See* Tex. Admin. Code §§ 89.1151–89.1191.  These procedures dictate that except for certain limitations or modifications from the Code of Federal Regulations, the Texas Rules of Civil Procedure and the Texas Rules of Evidence apply to due-process hearings.  *Id.* § 89.1185(d) (Tex. Educ. Agency, Hearing Procedures) ("Except as modified or limited by the provisions of 34 CFR, §§ 300.507–300.514 or 300.532, or this division, the Texas Rules of Civil Procedure

will govern the proceedings at the hearing and the Texas Rules of Evidence will govern evidentiary issues.").

The Court finds that the SEHO properly excluded the plaintiffs' expert under the Texas Rules of Civil Procedure, that the rules create a concurrent disclosure obligation with the applicable federal regulation, and that the plaintiffs' arguments that the SEHO abused her discretion are unpersuasive. Accordingly, the Court further finds that the SEHO did not abuse her discretion by excluding the plaintiff's expert.

> ### i. The SEHO properly excluded the plaintiffs' expert under the Texas Rules of Civil Procedure.

The Texas Rules of Civil Procedure require parties to supplement their expert-witness designations, and if a party fails to do so, a court may prohibit an expert from testifying at trial. Specifically, Texas Rule of Civil Procedure 193.5 states that:

> [i]f a party learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response[] . . . to the extent that the written discovery sought the identification of . . . expert witnesses.

Tex. R. Civ. P. 193.5(a). "An amended or supplemental response must be made reasonably promptly after the party discovers the necessity for such a response." Tex. R. Civ. P. 193.5(b). "[I]t is presumed that an amended or supplemental response made less than 30 days before trial was not made reasonably promptly." *Id.*

Failure to abide by these rules may result in exclusion of the expert witness:

> A party who fails to make, amend, or supplement a discovery response[] . . . in a timely manner may not . . . offer the testimony of a witness . . . who was not timely identified, unless the court finds that:
>
> > (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2)     the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

Tex. R. Civ. P. 193.6.

Here, the Texas Rules of Civil Procedure dictated the exclusion of the plaintiffs' expert witness.  Sweetwater served a request for production on plaintiffs, requesting expert statements and reports, communications with private evaluators, and copies of the resume or curriculum vitae of each testifying expert.  Dkt. No. 31 at 2–3.  In response to these requests, the plaintiffs did not provide any expert-witness information.  *See id.* at 37–40.  The plaintiffs persisted in declining to supplement their discovery responses even though they interacted with their expert over a month before the due-process hearing.  *Id.* at 68.  And even though Sweetwater requested at least once for the plaintiffs to supplement their discovery responses, the plaintiffs did not do so until less than ten days before the hearing started.[4]  *See id.* at 65, 67.  By failing to disclose their expert after meeting with him over a month before trial, the plaintiffs violated their duty to supplement their discovery responses reasonably promptly.[5]  Therefore, under Rule 193.6, the plaintiffs could not admit their expert's testimony or reports unless the SEHO found good cause for the failure to supplement or that the failure to supplement would not unfairly surprise or prejudice Sweetwater.  The SEHO made no such finding, *see* Dkt. No. 31 at 64–69, and the plaintiffs have not argued that the SEHO erred by declining to make such a finding, *see* Dkt. No. 33 at

---

[4] The plaintiffs do not dispute that they failed to supplement their discovery responses until within ten days of the hearing, and they do not dispute that their failure to supplement violated the Texas Rules of Civil Procedure.  *See* Dkt. No. 33 at 53–55; Dkt. No. 35 at 22.

[5] Additionally, because the plaintiffs supplemented their discovery responses and listed their expert less than 30 days before the hearing, it is presumed, under Rule 193.5(b) that they did not supplement reasonably promptly.

48–50; 35 at 22.  Therefore, the Court finds that the SEHO properly excluded the plaintiffs'

expert as required by the Texas Rules of Civil Procedure.

> ### ii.    States may set deadlines for disclosure of evaluations that are more stringent than the minimum five-business-day deadline set by 34 C.F.R. § 300.512(b)(1).

The plaintiffs argue that the SEHO improperly excluded their expert's testimony and

report because they complied with 34 C.F.R. § 300.512(b)(1), but the argument is

unavailing.  Section 300.512(b)(1) states that "[a]t least five business days prior to a

hearing[,] . . . each party must disclose to all other parties all evaluations completed by that

date and recommendations based on the offering party's evaluations that the party intends

to use at the hearing."  Additionally, under Section 300.512(b)(2), "[a] hearing officer may

bar any party that fails to comply with [Section 300.512(b)(1)] . . . from introducing the

relevant evaluation . . . without the consent of the other party."  The plaintiffs argue that

Section 300.512 modifies and limits Rules 193.5 and 193.6 because it specifically addresses

the admission of evidence at a special-education hearing.  Dkt. No. 33 at 54; Dkt. No. 35 at

22.  But the plaintiffs provide no authority to support their argument.

Contrary to the plaintiffs' argument, a review of Section 300.512's text does not

indicate that it modifies or limits Rules 193.5 or 193.6.  First, the text of Section

300.512(b)(1) does not expressly state that it modifies or limits other rules pertaining to the

admissibility of evaluations.  Also, Section 300.512(b)(1) does not conflict with Rules 193.5

and 193.6.  Section 300.512(b)(1) does not mandate that all evaluations disclosed more than

five days before the hearing are admissible.  Instead, Section 300.512(b)(1) requires

disclosure "at least five business days prior to a hearing."  The "at least" language only sets

a minimum amount of time for disclosure and does not prevent states from setting their own

rules, as required by Section 1415(f)(1)(A), that may require even earlier disclosure of evaluations.  Therefore, a review of the text of Section 300.512 indicates that the provision does not state or reasonably imply that states cannot require disclosure of evaluations earlier than five business days before the hearing, and, in particular, where the disclosure is not made reasonably promptly.  "Nothing is to be added to what the text states or reasonably implies . . . .  That is, a matter not covered is to be treated as not covered."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (Thompson/West 2012).  Thus, the Court finds that the text of Section 300.512 does not modify or limit Rules 193.5 or 193.6 and that these rules create disclosure obligations that run concurrently with the disclosure-requirement of Section 300.512.

> ### iii.  None of the cases that the plaintiffs cite support their assertion that the SEHO abused her discretion when she excluded the plaintiffs' expert witness.

The plaintiffs have failed to provide any authority that the SEHO abused her discretion by excluding the plaintiffs' expert witness.  First, the plaintiffs argue that "Congress determined that providing all evidence at least five business days prior to the due process hearing is sufficient."[6]  Dkt. No. 33 at 54.  To support this argument, the plaintiffs cite to *Spiegler v. D.C.*, 866 F.2d 461 (D.C. Cir. 1989), but this case is distinguishable.  *Spiegler* addresses the appropriate statute of limitations for bringing a civil action challenging state administrative proceedings under the Education of the Handicapped Act, which did not provide a statute of limitations.  *Id.* at 462.  *Spiegler* does not address the IDEA, Section

---

[6] This statement is factually incorrect; Congress does not write the rules that are published and codified in the Code of Federal Regulations.  *Laws and Regulations*, United States Senate, https://www.senate.gov/reference/reference_ index_subjects/Laws_and_Regulations_vrd.htm (last visited March 17, 2021) ("The Code of Federal Regulations (CFR) is a codification of the general and permanent rules published in the Federal Register by the executive departments and agencies of the federal government.").

300.512, or the five-business-day minimum notice period for disclosing evaluations. *See generally* 866 F.2d 461. And specifically, it does not address whether states can impose more demanding standards for disclosure of expert witnesses than those imposed by Section 300.512. *Id.* As a result, the Court does not find merit in the plaintiffs' argument that providing evidence at least five business days prior to the due-process hearing is sufficient regardless of a state's more demanding standard.

The plaintiffs also argue that total exclusion of evidence under Section 300.512(b)(2) is not appropriate and, therefore, that the SEHO erred by excluding their expert. Dkt. No. 33 at 54. To support their argument, the plaintiffs cite only one judicial opinion, *Carson v. D.C.*, 187 F. Supp. 3d 197, 204 (D.D.C. 2016). But *Carson* is distinguishable from this case. In *Carson*, the district court determined that it could consider a psychiatric evaluation on appeal that was not completed until one day before the administrative hearing and, therefore, was not presented at the hearing. *Carson*, 187 F. Supp. 3d at 204. Here, in contrast, the plaintiffs' expert completed his evaluation weeks before the five-business-day deadline. Dkt. No. 31 at 68. Sweetwater made multiple requests for disclosure, and despite the expert information's availability, the plaintiffs did not disclose as requested. *Id.* at 37–40, 65–68. Therefore, the Court concludes that *Carson* does not support a finding that the SEHO erred by excluding the plaintiffs' expert in this case.

Because the Court concludes that Rule 193.5, Rule 193.6, and Section 300.512(b) create concurrent disclosure obligations—and finds the plaintiffs' arguments that the SEHO abused her discretion unpersuasive—the Court finds that the SEHO properly excluded the plaintiffs' expert witness under Rules 193.5 and 193.6. At the very least, plaintiffs cannot show that the SEHO abused her discretion by excluding the witness.

**B.      The Court finds that the SEHO correctly found that Sweetwater did not deny L.G. a FAPE.**

"Relief under the IDEA is limited to a student's right to a FAPE."  *Doe v. Dall. Indep. Sch. Dist.*, 941 F.3d 224, 227 (5th Cir. 2019) (citing *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 (2017)).  A FAPE is:

> special education and related services that[:]
>
> (A)      have been provided at public expense, under public supervision and direction, and without charge;
>
> (B)      meet the standards of the State educational agency;
>
> (C)      include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D)      are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  Thus, a FAPE "is generally centered on a disabled student's access to adequate education by a school."  *Doe*, 941 F.3d at 227.

The plaintiffs argue that Sweetwater denied L.G. a FAPE  because it did not develop substantively appropriate IEPs and failed to address reports of bullying.  Because the plaintiffs have failed to meet their burden of showing either of these allegations by a preponderance of the evidence, the Court finds that Sweetwater did not deny L.G. a FAPE.

**i.      Sweetwater did not fail to develop substantively appropriate IEPs.**

"It is through the IEP that the [FAPE] . . . is tailored to the unique needs of a particular child."  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017) (internal quotations omitted).  "The IEP includes a statement of the special education, related services and accommodations the school will provide to the child."  *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012).  "[D]e novo review of the adequacy of an IEP is limited to two basic questions: (1) Did the school district comply with

the procedural requirements of the IDEA?; and (2) Is the IEP reasonably calculated to enable the student to receive educational benefits?"  *Id.* at 396.

With respect to the first inquiry, procedural defects alone do not constitute a violation of the right to a FAPE unless they impede the child's right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or cause deprivation of educational benefits.  *See* § 1415(f)(3)(E)(ii).  With respect to the second inquiry, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew*, 137 S. Ct. at 999.  And "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."  *Id.*

### a.     Sweetwater did not commit procedural violations of the IDEA.

The plaintiffs allege that Sweetwater procedurally violated the IDEA by presenting prior written notices that failed to communicate information to parents, presenting progress reports that failed to communicate necessary information to parents, improperly relying on an evaluation from 2016, and failing to allow an IEE not limited to areas previously evaluated.  Dkt. No. 35 at 18–19.  Because the plaintiffs fail to prove any alleged procedural violation by a preponderance of the evidence, the Court finds that the plaintiffs have not shown that Sweetwater committed procedural violations of the IDEA.

### 1.     Sweetwater issued sufficient prior written notices.

The plaintiffs do not show by a preponderance of the evidence that Sweetwater issued insufficient prior written notices.  In their briefing, the plaintiffs concede that Sweetwater issued prior written notices.  Dkt. No. 35 at 17.  But the plaintiffs argue only

that the notices were insufficient because they did not provide sufficient detail to allow parents to participate in their child's educational decisions in an informed way.  Dkt. No. 33 at 50.  A review of the prior written notices indicates that, contrary to the plaintiffs' contention, Sweetwater actually issued very detailed prior written notices detailing the proposed or refused actions and the reasons why those actions were proposed or refused. Dkt. No. 9-5 at 178; Dkt No. 31-2 at 59, 82–83; Dkt. No. 31-3 at 29, 39–40.  Even the earliest prior written notice at issue in the briefing, which is the least-detailed notice, provides sufficient detail as it only addresses the fact that Sweetwater conducted an annual ARDC meeting, which "is required by law."  *See* Dkt. No. 31-3 at 29.  Considering the significant amount of detail included in the prior written notices, the Court finds that the plaintiffs have failed to show by a preponderance of the evidence that the notices provided insufficient detail to allow active and informed participation by the parents in L.G.'s educational decisions.

### 2. Sweetwater did not present progress reports that failed to communicate necessary information.

The plaintiffs do not show by a preponderance of the evidence that Sweetwater presented progress reports that failed to communicate necessary information.  The IDEA requires districts to provide "periodic reports on the progress the child is making toward meeting the annual goals."  20 U.S.C. § 1414(d)(1)(A)(i)(III).  In their briefing, the plaintiffs concede that Sweetwater issued progress reports.  *See* Dkt. No. 33 at 49; Dkt. No. 35 at 19. Thus, the plaintiffs argue only that the parents could not meaningfully participate in the decision-making progress because Sweetwater drafted the progress reports in such a way that they were meaningless to the parents without more information.  Dkt. No. 33 at 50. Upon review of the progress reports, the Court finds that, contrary to the plaintiffs'

contentions, the progress reports provide a detailed description of L.G.'s goals and the percentage of progress toward accomplishing those goals. Dkt. No. 31-3 at 68–81; Dkt. No. 31-5 at 10–19. And even if the goals are confusing and possibly meaningless as the plaintiffs allege, the plaintiffs fail to point the Court to any evidence showing that the lack of detail in the progress reports in fact prevented the parents from meaningfully participating in the decision-making process. Dkt. No. 33 at 49; Dkt. No. 35 at 19. Therefore, the Court finds that the plaintiffs have failed to show by a preponderance of the evidence that the progress reports failed to communicate necessary information for the parents to meaningfully participate in the development of L.G.'s FAPE.

### 3. Sweetwater did not improperly rely on its 2016 evaluation of L.G.

The plaintiffs fail to show that Sweetwater improperly relied on its evaluation of L.G. from October 2016. The plaintiffs argue that Sweetwater improperly relied on the October 2016 evaluation because the evaluation did not evaluate L.G.'s true cognitive abilities and was incomplete. Dkt. No. 33 at 29. To support their cognitive-abilities argument, the plaintiffs allege that Sweetwater ignored the fact that L.G.'s language deficits negatively affected her cognitive assessments and improperly relied on subjective observations of parents and teachers on skills, including skills based on verbal abilities. *Id.* at 30. But the evidence does not support such an allegation. The 2016 assessment included evaluations from various sources: L.G.'s parent, two teachers, an educational diagnostician, a speech-language pathologist, a school nurse, and a counselor. Dkt. No. 40 at 2. The plaintiffs have not directed the Court to any evidence to support an assertion that any of these evaluators did not know about or failed to account for L.G.'s language impairment.

Furthermore, multiple pages of the 2016 analysis expressly discuss L.G.'s language impairment.  *Id.* at 2–6, 13–14, 17.

The plaintiffs also argue that the 2016 evaluation did not account for L.G.'s true cognitive abilities because the evaluation improperly applied the Developmental Profile – 3 (DP-3) assessment and conflicted with the 2018 IEE, but these arguments are futile.  Dkt. No. 33 at 26.  The plaintiffs argue that the DP-3 assessment "should be used in concert with additional data" and that, in the 2016 evaluation, the assessment was not used in concert with additional data.  The later assertion is plainly false.  The 2016 evaluation included many sources of data, including an Adaptive Behavioral Assessment, a Wechsler Individual Achievement Test, a  Preschool Language-5 Assessment, a Goldman-Fristoe Test of Articulation-3, language samples, informal observations, teacher information, classroom observation data, and a vision and hearing screening.  Dkt. No. 40 at 2.  Moreover, the only evidence that the plaintiffs present to show that the 2016 evaluation did not evaluate L.G.'s true cognitive abilities is an IEE from 2018.  Dkt. No. 33 at 31.  But the IEE, which was completed two years after the 2016 evaluation, cannot, on its own, show the cognitive abilities of L.G. at the time of the 2016 evaluation.  Because all of the plaintiffs' arguments that Sweetwater failed to evaluate L.G.'s true cognitive abilities in the 2016 evaluation fail, Court finds that the plaintiffs have failed to show by a preponderance of the evidence that Sweetwater failed to evaluate L.G.'s true cognitive abilities.

Additionally, the plaintiffs argue that the 2016 evaluation was not complete because Sweetwater failed to conduct a formal OT evaluation, an FBA, and an evaluation of L.G.'s ADHD, but the plaintiffs do not present sufficient evidence to show that an OT evaluation or FBA was necessary.  When conducting an evaluation, a school district "shall ensure

that[] . . . the child is assessed in all areas of suspected disability." 20 U.S.C.

§ 1414(b)(3)(B). The evidence shows, contrary to the plaintiffs' contention, that L.G.

exhibited no academic need for an OT evaluation. L.G. could manipulate a keyboard and

mouse, hold a pencil, bubble answer choices, trace letters of the alphabet accurately, care for

herself, and demonstrate proper letter placement on a line. Dkt. No. 31-1 at 57–62, 67–68;

Dkt. No. 31-5 at 72–73, 203. L.G. also had no weakness in grasp and had good spatial

awareness. *Id.* The only evidence that the plaintiffs point to in support of their contention

that an OT evaluation was warranted are two statements in L.G.'s 2016 evaluation that she

had below-average fine motor skills. *See* Dkt. No. 35 at 22; Dkt. No. 9-4 at 31, 97. But the

Court finds that these statements, when considered along with the other evidence that an

OT evaluation was not warranted, do not prove, by a preponderance of the evidence, that

Sweetwater needed to subject L.G. to an OT evaluation.

The plaintiffs contend that Sweetwater should have conducted an FBA of L.G. in its

2016 assessment, but the evidence indicates otherwise. *See* Dkt. No. 31-1 at 67. Evidence in

the record shows that L.G. had good behavior, did not have any discipline on her record,

had not been suspended, and consistently achieved high marks in the area of conduct. Dkt.

No. 31-1 at 49–53; Dkt. No. 31-5 at 198. To support their allegation that Sweetwater should

have conducted an FBA, the plaintiffs note only that L.G.'s parents reported that L.G.

would scream for no reason and throw herself on the floor. Dkt. No. 35 at 22; Dkt. No. 9-4

at 33. Considering the other evidence that an FBA was not warranted, the Court finds that

the parents' report by itself does not show, by a preponderance of the evidence, that

Sweetwater needed to conduct an FBA.

The plaintiffs also argue that Sweetwater should have evaluated L.G.'s ADHD, but the evidence shows such an evaluation was not necessary.  In fact, Becky Kidd, an educational diagnostician and L.G.'s kindergarten and first-grade teacher, testified at the due-process hearing that she did not observe L.G. showing signs of ADHD and that L.G.'s parents never suggested ADHD to the ARDC.  Dkt. No. 9-8 at 111, 117, 158–59. Additionally, Debra Wilson, L.G.'s special education teacher in January 2019 testified that she did not observe L.G. showing signs of ADHD and that L.G.'s parents never suggested to her that L.G. had ADHD.  *Id.* at 429, 470.  The only evidence that the plaintiffs provide in opposition is data from evaluations of L.G. in 2018—two years after the 2016 evaluation—showing that L.G. had short-term-memory deficits.  *See* Dkt. No. 33 at 33; Dkt. No. 9-4 at 43–47, 56.  First, this data is separate from the 2016 evaluation and minimally relevant to the determination of whether L.G. needed to be evaluated for ADHD. Additionally, the plaintiffs present no evidence to show that Sweetwater should have suspected that L.G. had ADHD based solely on the fact that she had short-term memory deficits.  Therefore, considering the testimony of Kidd and Wilson alongside the plaintiffs' evidence, the Court finds that the plaintiffs have not shown by a preponderance of the evidence that Sweetwater needed to evaluate L.G. for ADHD.

Because the plaintiffs have failed to show that the 2016 evaluation failed to evaluate L.G.'s true cognitive abilities or was incomplete because it failed to evaluate L.G. in areas of suspected disability, Sweetwater did not improperly rely on the 2016 evaluation.

### 4.    Sweetwater did not deny L.G.'s parents an IEE.

Legal authority does not support the plaintiffs' contentions that an IEE must be granted to assess even areas not assessed in a previous evaluation, and the plaintiffs have failed to show that Sweetwater violated IDEA by limiting the IEE providers from whom

parents could choose.  20 U.S.C. § 1415(b) states that "[t]he procedures required by this section shall include . . . an opportunity for the parents of a child with a disability to . . . obtain an independent educational evaluation of the child."  Therefore, "[t]he parents of a child with a disability have the right . . . to obtain an independent education evaluation of the child."  300 C.F.R. § 300.502(a)(1).

The plaintiffs argue that Sweetwater should have granted them an IEE at public expense that provided an OT evaluation and an FBA, but that argument is baseless.  "A parent has the right to [an IEE] at public expense if the parent disagrees with an evaluation obtained by the [school district]."  *Id.* § 300.502(b)(1).  The text of Section 300.502(b)(1) specifically requires a disagreement with an evaluation before a parent becomes entitled to an IEE.  *Id.*  A disagreement occurs where there is "[a] difference of opinion[,] or a lack of agreement."  *Disagreement*, *Black's Law Dictionary* (10th ed. 2014).  Therefore, if an evaluation does not provide an opinion in a particular area, any opinion that a parent may have with respect to the student's capabilities in that area is not a difference of opinion with the evaluation and, therefore, cannot be a disagreement with the evaluation.  Additionally, nothing in Section 1415 or 300.502 entitles parents to an IEE at public expense where the district has not done an evaluation.  Accordingly, under Section 300.502, a parent is not entitled to an IEE in a certain area unless the school district has previously evaluated that student in the particular area.

Reading Section 300.502(b)(1) in context with Section 300.502(b)(2) confirms that a parent is not entitled to an IEE in areas that the school district has not evaluated.  When interpreting a legal provision, "[t]he text must be construed as a whole."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (Thompson/West 2012).

Additionally, "every provision is to be given effect[,]" and no provision "should needlessly be given an interpretation that causes it to . . . have no consequence." *Id.* at 174. Section 300.502(b)(2) allows a school district, after a parent has filed a request for an IEE at public expense, to challenge that request by filing "a due process complaint to request a hearing to show that its evaluation is appropriate[.]" Section 300.502(b)(2) requires a school district to show that its evaluation was appropriate. But this requirement presupposes that the school district has made an evaluation. Therefore, without an evaluation, a school district cannot fulfill its burden of showing that its evaluation was appropriate. Accordingly, if parents could demand an IEE beyond the scope of the school district's evaluation, the school district could never prove that its evaluation was appropriate because the school district would have to prove the appropriateness of the evaluation in areas not evaluated. Thus, in a situation where parents could and do demand an IEE at public expense to evaluate disabilities not previously evaluated, the school district's ability to challenge the necessity for an IEE under Section 300.502(b)(2) would be surplusage. Because courts should not needlessly interpret legal provisions in a way that causes other provisions to be rendered surplusage, Section 300.502(b)(2) when read alongside Section 300.502(b)(1), confirms that parents cannot request an IEE beyond the scope of previous evaluations.

Persuasive authority supports this conclusion. *See D.S. By & Through M.S. v. Trumbull Bd. of Educ.*, 357 F. Supp. 3d 166, 175 (D. Conn. 2019), *rev'd and remanded on separate grounds*, 975 F.3d 152 (2d Cir. 2020). In *Trumbull*, a school district agreed to conduct an FBA on a student. *Id.* at 173. After the FBA was completed, the parents requested an IEE at public expense. *Id.* at 174. But the IEE that the parents requested exceeded the scope of the conducted FBA. *Id.* The district court, interpreting Section

300.502(b)(1) concluded that "the parents' disagreement with the FBA . . . did not entitle
them to a publicly funded IEE for the additional requested assessments that were beyond
the scope of the FBA."[7]  *Id.* at 178.

Like the parents in *Trumbull*, L.G.'s parents requested an IEE at public expense that
exceeded the scope of the 2016 evaluation.  Therefore, like *Trumbull*, the Court, considering
the text of Section 300.501(b)(1), along with other provisions in Section 300.502, finds that
L.G.'s parents did not have a right to request a publicly funded IEE to evaluate areas not
previously evaluated by the school district.[8]  Accordingly, Sweetwater did not commit a
procedural violation of the IDEA by declining to grant the plaintiffs an IEE at public
expense that provided an OT evaluation and a FBA.[9]

---

[7] *Trumbull* also noted that allowing parents to request an IEE that exceeds the scope of the previous
evaluation would "create a virtually limitless right" and incentivize abuse of the evaluation system.
*Id.* at 177.  For example, under such an interpretation of Section 300.501(b)(1), a parent may "use
the occasion of [an examination] . . . to demand that the public pay for a panoply of . . . [other]
evaluations by independent specialists."  *Id.*

[8] To support their argument, the plaintiffs cite two letters from the United States Department of
Education's Office of Special Education Programs.  Dkt. No. 33 at 47.  Both letters state that they
are "provided as informal guidance and [are] not legally binding."  Ruth E. Ryder, *Letter to Carroll*,
The U.S. Dep't of Educ. Off. of Special Educ. and Rehab. Servs. (Oct. 22, 2016), https://www2.ed.
gov/policy/speced/guid/idea/memosdcltrs/carroll-iee-policy.pdf?fbclid=IwAR1ByEzZdsIaPsJLtIJ
0cv3nTjBod0QO4_6EvPQV2pODpqfimrMFNi--kWM; Melody Musgrove, *Letter to Baus*, The U.S.
Dep't of Educ. Off. of Special Educ. and Rehab. Servs. (Feb. 23, 2015), https://sites.ed.gov/idea/
files/idea/policy/speced/guid/idea/memosdcltrs/acc-14-012562r-baus-iee.pdf.  Therefore, the
Court does not find these letters authoritative on the issue of whether parents have a right to a
publicly funded IEE to evaluate areas not previously evaluated by the school district.

[9] This conclusion does not deny parents a path to challenge an evaluation that they believe did not
assess all areas of suspected disability.  20 U.S.C. § 1415(b)(1) requires that parents have "[a]n
opportunity . . . to present a complaint[] . . . with respect to any matter relating to the . . . evaluation
. . . of the child."  Therefore, parents may request a due-process hearing to challenge an evaluation
that they do not believe was properly conducted.  Additionally, Section 1414(a)(2)(A) provides that
"[a] local educational agency shall ensure that a reevaluation of a child with a disability is conducted
. . . if the child's parents . . . request[] a reevaluation."  Such a reevaluation can occur once a year or
more frequently if the parent and the school district agree.  § 1414(a)(2)(B).  In this case, the parents
did have an opportunity to get a broader evaluation of L.G.  In fact, Sweetwater did offer to conduct
a new evaluation of L.G. in 2018 and expressed that "[t]he committee is ready, willing and able to
conduct a new [evaluation] to gather additional data at any time."  Dkt. No. 40 at 22.  Instead of

Furthermore, the plaintiffs argue that Sweetwater procedurally violated the IDEA by limiting the providers from whom they could choose to perform an IEE, but they fail to show that such limitations were unlawful. Section 300.502 itself allows school districts to provide some limitations on the individuals the parents may choose to conduct an IEE:

> If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation.

Accordingly, a school district does not violate the IDEA when it does not allow the parents to use an evaluator for an IEE at public expense and does not file a due-process hearing to defend its position where the evaluator does "not meet the reasonable criteria of the [school district]." *See A.L. v. Jackson Cty. Sch. Bd.*, 635 F. App'x 774, 782 (11th Cir. 2015).

Here, the plaintiffs do not even allege that Sweetwater's criteria for suitable IEE evaluators were unreasonable or different than the criteria under which an evaluation is obtained. *See* Dkt. No. 35 at 21–22. Instead, the plaintiffs argue that Sweetwater should have filed a due-process hearing to defend its improper denial of IEE providers outside of its geographical criteria[10] and that Sweetwater forced them into picking a provider on its provider list. *See id.* But the text of Section 300.502(e)(1) allows school districts to create criteria limiting the evaluators who can be used for a publicly funded IEE, including criteria pertaining to the location of the IEE. Additionally, Section 300.502 contains no provision

accepting the offer for a reevaluation, L.G.'s parents requested an IEE that exceeded the scope of the 2016 evaluation. *Id.* Therefore, even though Sweetwater did not permit L.G.'s parents to obtain a publicly funded IEE that exceeded the scope of the 2016 evaluation, the parents had an opportunity to challenge the 2016 evaluation by accepting the offer for a reevaluation.

[10] The plaintiffs do not challenge that there were qualified evaluators that met Sweetwater's geographical criteria. *See id.*

requiring, or even permitting, schools to initiate due-process hearings to support their denial of an IEE evaluation based on geographical criteria. And the plaintiffs point to no such provision. *See* Dkt. No. 35 at 21–22. Therefore, under the text of Section 300.502, school districts may place geographical limitations on IEE evaluators and may deny payment of expenses of an IEE evaluator that does not meet its geographical criteria.

Although the Fifth Circuit has not addressed this issue, the Eleventh Circuit has held that a school district does not violate the IDEA by providing an IEE evaluator within its reasonable geographical limits and denying use of an evaluator outside of those limits without initiating a due-process hearing. *Jackson*, 635 F. App'x at 782. In *Jackson*, a school district denied a request for a specific IEE evaluator citing that there were appropriate evaluators located closer and denied reimbursement of the costs of the evaluator when the student's parents engaged that evaluator. *Id.* The school district did not initiate a due-process hearing when it denied the request. *See id.* The student argued that the school district violated Section 300.502 by denying to pay for the evaluator. *Id.* The Eleventh Circuit held that the school district "complied with the requirements of [3]4 C.F.R. § 300.502 by making available an IEE at its own expense by a qualified provider within the relevant geographic area." *Id.* The Eleventh Circuit further held that the school district "was not required to give into the unreasonable demands of the parent when a suitable local evaluator was available." *Id.* Therefore, the Court finds that Sweetwater did not improperly deny the plaintiffs' requests for IEE evaluators that did not meet its geographical criteria and did not need to initiate a due-process hearing when it denied the requests.

Finally, the plaintiffs point to no evidence that Sweetwater forced them to pick an IEE evaluator on its preferred list. In fact, the evidence that the plaintiffs point to in support

of their assertion indicates otherwise.  *See* Dkt. No. 9-7 at 165–68, 217.  Sweetwater

considered all of the evaluator suggestions presented by the plaintiffs.  *See id.*  And there is

no evidence that the plaintiffs ever presented an evaluator suggestion that met Sweetwater's

criteria.  *See id.*  Finally, the evidence shows that after various back-and-forth

communications between the plaintiffs and Sweetwater, the plaintiffs "chose one of the

district's[] . . . choices."  *Id.* at 217.  Therefore, the Court finds that the plaintiffs have not

proven by a preponderance of the evidence that Sweetwater forced them to pick a provider

from its preferred list.

Because Section 300.502(b)(1) does not require a school to grant an IEE that exceeds

the scope of the previous evaluation and the plaintiffs have failed to show that Sweetwater

violated IDEA by limiting the IEE providers from whom parents could choose, Sweetwater

did not deny L.G. an IEE.

**b.  Sweetwater offered L.G. an IEP that was reasonably
calculated to enable her to receive educational benefits.**

Four factors guide a court's analysis of whether a student's IEP is reasonably

calculated to enable her to receive educational benefits.  *Klein*, 690 F.3d at 396.  Those

factors include whether: "(1) the program is individualized on the basis of the student's

assessment and performance; (2) the program is administered in the least restrictive

environment; (3) the services are provided in a coordinated and collaborative manner by the

key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated."

*Id.*  When analyzing these factors, "district courts are [not] required to consider them or to

weigh them in any particular way."  *Id.*  Instead, district courts should use these factors to

determine whether the student's "educational program [was] appropriately ambitious in

light of [her] circumstances."  *Endrew*, 137 S. Ct. at 1000.  Because all of these factors weigh

in favor of finding that Sweetwater's educational program for L.G. was appropriately ambitious in light of her circumstances, the Court finds that L.G.'s IEP was reasonably calculated to enable her to receive educational benefits.

### 1.   L.G.'s IEP was individualized on the basis of her assessment and performance.

The plaintiffs have failed to meet their burden of showing that L.G.'s IEP was not individualized on the basis of L.G.'s assessment and performance.  "IDEA contains several statutory individualized considerations that school districts must account for when designing an IEP."  *R. S. By & Through Ruth B. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 330 (5th Cir. 2020).  These considerations include: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child."  20 U.S.C. § 1414(3)(A).

Here, the evidence indicates that Sweetwater considered L.G.'s strengths, the concerns of the parents, the results of the 2016 evaluation, and L.G.'s academic, developmental, and functional needs.  First, Sweetwater considered L.G.'s ability to recognize letters, spell simple words, answer comprehension questions, pronounce certain phenomes and speech, hold a pencil and copy what she sees, count, and identify shapes and colors.  Dkt. No. 31-1 at 30–31, 36–40.  Second, Sweetwater considered the concerns of the parents by having its representatives attend the ARDC meetings, state the goals in the IEPs, and retrieve parent information.  *Id.* at 42.  Third, Sweetwater relied on the 2016 evaluation when creating the IEP.  *See* Dkt. No. 33 at 29; Dkt. No. 35 at 6.  Finally, Sweetwater considered, in detail, L.G.'s academic and developmental weaknesses when developing L.G.'s IEP.  Dkt. No. 31-1 at 30–31, 36–40.  Therefore, the Section 1414(3)(A)

considerations indicate that L.G.'s IEP was individualized on the basis of L.G.'s assessment and performance.

The plaintiffs assert three arguments in an attempt to show otherwise, but each falls short. First, the plaintiffs assert that teacher observations cannot support a finding that an IEP is appropriate. Dkt. No. 33 at 26. But in the Fifth Circuit, this argument lacks merit where the plaintiffs, as here, fail to discredit the teacher observations as unreliable. *See Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007) (upholding a district court's determination that the testimony of a student's teachers was more reliable than the student's physicians' testimony). And in an unpublished opinion, the Fifth Circuit has held "that teacher observations[] . . . are especially instructive as they spend more time with students than do outside evaluators." *D. L. By & Through J.L. v. Clear Creek Indep. Sch. Dist.*, 695 F. App'x 733, 737 (5th Cir. 2017), *as revised* (July 31, 2017). Considering this precedent, the Court rejects the plaintiffs' first argument.

The plaintiffs also claim that the IEPs were not sufficiently individualized on the basis of L.G.'s assessment and performance because Sweetwater relied on the 2016 evaluation when creating the IEPs. Dkt. No. 33 at 29–34. As discussed in more detail in Section 3(B)(i)(a)(3), the Court finds that the 2016 evaluation complied with the IDEA requirements and, therefore, that Sweetwater's reliance on that evaluation was proper.

The plaintiffs finally argue that the IEPs were not sufficiently individualized because Sweetwater issued multiple PLAAFPs for L.G. that were not substantively appropriate. The development of the IEP begins with the PLAAFP. *E. R. by E. R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 767 (5th Cir. 2018) (citing *Endrew*, 137 S. Ct. at 1000). The PLAAFP must include:

(aa)    how the child's disability affects the child's involvement and progress in the general education curriculum;

(bb)    for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; and

(cc)    for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

20 U.S.C. § 1414(d)(1)(A)(i)(I).  The plaintiffs do not argue that any PLAAFP failed to include any items required by Section 1414(d)(1)(A)(i)(I).  Instead, the plaintiffs argue that multiple PLAAFPs were so vague that they were meaningless and were not expressed in objectively measurable terms because they did not include data from objective tests or interpret listed test scores.  Dkt. No. 33 at 36.

The plaintiffs' argument that multiple PLAAFPs were so vague that they were meaningless is not supported by the facts.  A review of the PLAAFPs indicates that, contrary to the plaintiffs' contention, Sweetwater actually issued very detailed PLAAFPs that explained L.G.'s current levels of achievement in various areas.  *See* Dkt. No. 9-5 at 47–48, 155–56.  Even the least-detailed description of L.G.'s current levels of achievement— "L.G. is able to hold a pencil, write independently, and copy what she sees.  L.G. has difficulty with sentence structure."—is not so vague that it is useless.  Dkt. No. 9-5 at 47. Considering the detail included in the PLAAFPs, the plaintiffs have failed to show by a preponderance of the evidence that the notices were so vague that they were useless.[11]

Moreover, the plaintiffs' argument that a PLAAFP needs to include data from objective tests is not supported by the statutory text or legal precedent.  Section

---

[11] To support their assertion, the plaintiffs cite the PLAAFPs listed in the evaluations that Sweetwater conducted.  *See* Dkt. No. 33 at 38; Dkt. No. 9-4 at 31, 97–99.  Contrary to the plaintiffs' contention, these PLAAFPs also provide sufficient detail as to L.G.'s levels of achievement.  *See* Dkt. No. 9-4 at 31, 97–99.

1414(d)(1)(A)(ii) states that "[n]othing in this section shall be construed to require[] . . . that additional information be included in a child's IEP beyond what is explicitly required in this section." This text directs courts not to add any PLAAFP requirements other than those explicitly stated in Section 1414(d)(1)(A)(i)(I). Additionally, "[a]n absent provision cannot be supplied by the courts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (Thompson/West 2012). Here, Section 1414(d)(1)(A)(i)(I) contains no provision requiring that a PLAAFP include data from objective tests. And the plaintiffs fail to point the Court to any binding precedent creating such a requirement. Thus, the Court declines to conclude that a PLAAFP must include data from objective tests and rejects the plaintiffs' argument that failure to include such data rendered L.G.'s PLAAFPs deficient.[12]

The plaintiffs' other argument—that the PLAAFPs included no context or interpretation of the noted test scores—is not supported by the facts. In fact, L.G.'s PLAAFPs include an explanation of the meaning of each cited assessment. *See* Dkt. No. 9-4 at 882; Dkt. 9-5 at 899, 942. For example, the PLAAFPs state that L.G.'s Istation report shows that she is working at a pre-kindergarten level, that she scored at a kindergarten level in her STAR reading assessment, and that she scored well below her age range in her math assessment. *Id.* Therefore, the Court rejects the plaintiffs' argument that the scores noted in the PLAAFPs did not include context or interpretation.

Because the Court finds that Sweetwater considered the statutory factors it was required to consider when developing the IEP and that the plaintiffs have failed to show that

---

[12] The Court also finds that even if Sweetwater was required to include data from objective tests in L.G.'s PLAAFPs, Sweetwater has met that requirement. L.G.'s PLAAFPs include data from objective tests including the STAR reading assessment, the STAR math assessment, and the Istation assessment. Dkt. No. 9-4 at 882; Dkt. 9-5 at 899, 942.

L.G.'s IEP was not sufficiently individualized, L.G.'s IEP was individualized on the basis

of her assessment and performance.  Accordingly, this factor weighs in favor of finding that

Sweetwater developed an appropriate IEP for L.G.

> ### 2.    L.G.'s IEP was administered in the least-restrictive environment.

The plaintiffs have failed to show by a preponderance of the evidence that L.G. was

not educated in her least-restrictive environment.  "To the maximum extent appropriate,

children with disabilities, including children in public or private institutions or other care

facilities, are educated with children who are not disabled[] . . . ."  20 U.S.C. §

1412(a)(5)(A).  "[S]pecial classes, separate schooling, or other removal of children with

disabilities from the regular educational environment occurs only when the nature or

severity of the disability of a child is such that education in regular classes with the use of

supplementary aids and services cannot be achieved satisfactorily."  *Id.*  Therefore, courts

apply a two-part test when determining whether a student was placed in the least-restrictive

environment.  *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010).  First,

courts ask "whether education in the regular classroom, with the use of supplemental aids

and services[,] can be achieved satisfactorily for [the] . . . child."  *Id.*  If education in the

regular classroom cannot be achieved satisfactorily, courts ask whether "the school has

mainstreamed the child to the maximum extent appropriate."

Here, the plaintiffs argue that L.G. was not placed in the least-restrictive

environment because she was mainstreamed in science and social studies when education in

the regular classroom could not be achieved satisfactorily.  *See* Dkt. No. 33 at 39.  When

determining whether education in the regular classroom can be accomplished satisfactorily,

courts should consider various factors, including:

(1)    "whether the child will receive an educational benefit from regular education";

(2)    "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child"; and

(3)    "what effect the ... child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving."

*A. B. By & Through Jamie B. v. Clear Creek Indep. Sch. Dist.*, 787 F. App'x 217, 222 (5th Cir. 2019) (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1049–50 (5th Cir. 1989)).

The first factor weighs in favor of finding that Sweetwater could satisfactorily educate L.G. in the regular classroom in science and social studies. When considering whether a child will receive a benefit from a regular education, courts "focus on the student's ability to grasp the essential elements of the regular education curriculum" and consider the nature of the child's handicap as well as the curriculum and goals of the regular-education class. *Daniel*, 874 F.2d at 1049. Here, the evidence indicates that mainstreaming L.G. in science and social studies played to her strengths and allowed her to grasp the essential elements of the curriculum. At the due-process hearing, L.G.'s independent evaluator testified that L.G.'s listening skills were one of her strengths and that Sweetwater needed to play to her strengths. Dkt. No. 9-8 at 380. Accordingly, the independent evaluator testified that L.G. would do well in science and social studies in the regular classroom and that she would learn in that environment. *Id.* And other evidence in the record supports the fact that L.G. did in fact learn in her science and social-studies classes. L.G.'s science and social-studies teacher testified at the due-process hearing that she participated in all class activities. Dkt. No. 37 at 209. Additionally, the teacher testified

that, in her class, her students, including L.G., learned from each other.  *Id.* at 214.  Finally, L.G. earned passing grades in her science and social-studies classes.  *Id.* at 88–92.

The plaintiffs argue that the first factor weighs in their favor because L.G. received no academic benefit in her science and social-studies classes, Dkt. No. 33 at 41, but this argument is not supported by the evidence.  Specifically, the plaintiffs argue that L.G. did not receive academic benefit because she only had to participate to achieve passing grades.  But even though the plaintiffs provide many record citations to support their assertion that L.G. was graded on a participation basis, they fail to cite to any evidence that L.G. did not receive any academic benefit from her science and social-studies classes.[13]  Because there is evidence that L.G. received academic benefit from her science and social-studies classes and a lack of evidence to the contrary, the first factor weighs in favor of finding that she was educated in her least-restrictive environment.

The second factor also weighs in Sweetwater's favor.  When considering the child's overall experience in the mainstreamed environment, courts should consider that the overall education experience may tip in favor of mainstreaming where the student absorbs little from the regular-education program but benefits enormously from social interaction with peers.  *Daniel*, 874 F.2d at 1049.  But the overall experience tips against mainstreaming where such placement would cause the child to suffer.  *Id.*  The evidence indicates that in addition to receiving academic benefit in her science and social-studies classes, L.G. benefitted from interactions with her non-disabled peers.  According to L.G.'s science and social-studies teacher, L.G. participated in collaborative projects with her classmates.  Dkt.

---

[13] The plaintiffs cite to the private evaluation of L.G. for the proposition that L.G. "was not making academic progress in light of her unique abilities."  Dkt. No. 33 at 43.  The private evaluation contains no such assertion.

No. 37 at 207.  The teacher also testified in the due-process hearing that in science and social studies, L.G. learned to be around peers, improved her social skills, participated in class discussions, saw what other students did in the regular classroom environment, and learned from her classmates.  *Id.* at 214.  This evidence indicates that L.G. received the non-academic benefit of being able to interact with her peers by being placed in the regular classroom for science and social studies.

The plaintiffs allege that L.G.'s regular classes were detrimental to her because she was bullied in those classes, but the plaintiffs have not shown by a preponderance that L.G. was in fact bullied.  L.G.'s science and social-studies teacher testified that she had positive interactions with her classmates, that the class was sweet and kind, and that the students loved each other.  *Id.* at 208.  The teacher also testified that she had never seen L.G. have negative interactions with—or be bullied by—other students.  *Id.* at 209.  The only evidence the plaintiffs present to support their assertion that L.G. was bullied in class is L.G.'s mother's subjective testimony.  Dkt. No. 9-8 at 7–12, 47–48.  And at no point in this testimony did L.G.'s mother allege that L.G. was bullied in her science or social-studies classes.  *See id.*  Also, L.G.'s mother never observed her in these classes.  *Id.* at 28.  Thus, given the testimony of L.G.'s teacher, who actually observed her in class, the Court finds that L.G.'s mother's testimony alone does not show by a preponderance of the evidence that L.G. was bullied.

Finally, the third factor weighs in favor of finding that Sweetwater could satisfactorily educate L.G. in the regular classroom in science and social studies.  If a child will engage in disruptive behavior due to her handicap or will require so much teacher attention that the teacher will have to ignore other students' needs to tend to the child, the

effect of the child's presence will weigh against mainstreaming.  *Daniel*, 874 F.2d at 1049.
The evidence here does not indicate that L.G. disrupted her classmates or demanded so
much attention that the teacher was forced to ignore other students.  In contrast, L.G.'s
science and social-studies teacher testified that L.G. participated in everything the class did.
Dkt. No. 37 at 209.  The teacher did comment that she had L.G. work on a special-needs
learning program upon her arrival and prior to the start of the science or social-studies
period.  *Id.* at 206, 208.  She would also modify the curriculum by providing L.G. with
pictures to allow her to access the curriculum.  *Id.*  But the teacher did not comment that
L.G. engaged in disruptive behavior or that the modifications required the teacher to ignore
other students; instead, she testified that she liked having L.G. in her class.  *Id.* at 214.
Because the evidence indicates that L.G.'s presence in the classroom did not negatively
impact the other students' ability to learn, the third factor weighs in favor of finding that
L.G. was educated in her least-restrictive environment.

Because all three factors relevant to the issue of whether education in the regular
classroom can be achieved satisfactorily weigh in favor of Sweetwater's placement of L.G.
in mainstreamed science and social-studies classes, the Court finds that Sweetwater did not
mainstream L.G. inappropriately.  Therefore, Sweetwater administered L.G.'s IEP in the
least-restrictive environment.

### 3. Services were provided in a coordinated and collaborative manner by the key stakeholders.

The evidence indicates that L.G.'s parents had the opportunity to collaborate with
the other individuals responsible for crafting L.G.'s educational plan.  The statute requires a
school district to ensure that the IEP Team periodically review and revise the plan.  20
U.S.C. § 1414(d)(4)(A).  An IEP Team includes the parents of a disabled child, at least one

regular-education teacher, at least one special-education teacher, a representative of the local educational agency, an individual who can interpret the instructional implications of evaluation results, any other individual who the parent or school district would like to add, and the child if appropriate.  *Id.* at § 1414(d)(1)(B).

Though the IDEA gives parents a right to provide meaningful input as part of the IEP team, this right "is simply not the right to dictate an outcome and obviously cannot be measured by such."  *Highland Park*, 951 F.3d at 335.  Therefore, "[a]bsent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the [parents'] input, [a school district meets the] IDEA requirements with respect to parental input."  *White*, 343 F.3d at 380.

In this case, the evidence indicates that Sweetwater did not exclude the parents or refuse to listen to their input and that Sweetwater actively worked to include the parents. Sweetwater met its obligation to convene at least one ARDC meeting per year, and at least one parent attended each of those meetings.  *See* Dkt. No. 31-1 at 107, 128; Dkt. No. 31-2 at 126; Dkt. No. 31-3 at 28; Dkt. No. 31-4 at 10, 77, 101.  At the ARDC meetings, the parents participated in the discussions and asked questions.  Dkt. No. 31-5 at 84, 114–15, 132, 152; Dkt. No. 31-6 at 37.  Additionally, the parents were invited to participate in the discussion. Dkt. No. 31-5 at 120; Dkt. No. 9-8 at 32–33.  And Sweetwater took steps to make sure the parents were apprised of the appropriate information to ensure their ability to meaningfully participate.  Dkt. No. 31-5 at 93.  Finally, Sweetwater did consider the parents' requests and concerns.  Dkt. No. 9-5 at 76, 154, 176.

Moreover, the plaintiffs' arguments that Sweetwater did not provide services in a coordinated and collaborative manner fail.  The plaintiffs first argue that Sweetwater failed

to provide them with necessary information regarding L.G.'s assessments and progress by failing to provide appropriate prior written notices and to provide an appropriate IEE. Dkt. No. 33 at 46–50. As discussed in Sections Section 3(B)(i)(a)(3) and 3(B)(i)(a)(4), however, Sweetwater did not violate the IDEA when it considered data from the 2016 evaluation when crafting L.G.'s IEP or when it declined to provide an IEE at public expense beyond the scope of the 2016 evaluation. Therefore, this first argument fails.

Additionally, the plaintiffs argue that the progress reports provided for L.G. were not written in objective, measurable terms the parents could understand, Dkt. No. 33 at 9, but a review of the progress reports indicates otherwise. To support their argument, the plaintiffs cite one goal, which states that "given a word bank and sight words, . . . [L.G.] will decode words in context and in insolation by applying common letter-sound correspondences in 4 out of 5 successful attempts." *Id.* The plaintiffs specifically argue that because completion of this goal requires decoding in context and isolation, it is written in such a way that percentage of process is meaningless. *Id.* But this argument omits the main skill that this goal addresses—application of common letter-sound correspondences. Dkt. No. 9-6 at 10. Considering that this skill is the main focus of the goal, percentage values of completion are valuable because they indicate L.G.'s progress toward applying common letter-sound correspondences generally. Therefore, the Court finds that this goal is written in objective, measurable terms that L.G.'s parents could understand. Additionally, the goals not mentioned in the plaintiffs' argument are detailed and written in such a way that the completion percentage assigned indicates L.G.'s actual skills in the areas covered by the goal. Dkt. No. 9-6 at 5–14. Therefore, contrary to the plaintiffs' contention, L.G.'s goals were actually written in objective, measurable terms that her parents could understand.

Finally, the plaintiffs argue that Sweetwater refused to discuss L.G.'s perception of bullying and the impact it had on her education, but they fail to provide any evidence that Sweetwater did in fact refuse to discuss L.G.'s perception of bullying.  Dkt. No. 33 at 46. The evidence shows that Sweetwater gave the parents an opportunity to discuss bullying but that they focused on other topics instead.  *See* Dkt. No. 40 at 20–21, 23, 27.  Considering that the evidence indicates that Sweetwater did not exclude the parents or refuse to listen to their input at the ARDC meetings and that the plaintiffs have failed to meet their burden of supporting their assertions to the contrary, the Court finds that Sweetwater provided services to L.G. in a coordinated and collaborative manner by the key stakeholders.

### 4.   L.G.'s program produced positive academic and non-academic benefits.

The evidence indicates that L.G. received academic and non-academic benefits, and the plaintiffs have failed to show that those benefits were de minimus.  "Whether a student demonstrates positive academic and non-academic benefits is one of the most critical factors in this analysis."  *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813–14 (5th Cir. 2012) (internal quotations omitted).  When determining whether a program has produced positive academic and non-academic benefits, courts do not ask whether the IEP maximized a student's educational potential.  *Id.* at 814.  Instead, courts look to whether a student "demonstrated more than de minimus positive academic and non-academic benefits."  *Id.*  A school district demonstrates more than de minimus positive academic and non-academic benefits if it provides a "basic floor of opportunity, specifically designed to meet the child's unique needs, supported by services that will permit [her] to benefit from the instruction."  *Plano*, 607 F.3d at 1015.

"[A] disabled child's development should be measured not by his relation to the rest of the class . . . ." *Hous. Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000). Instead, development should be measured "with respect to the individual student, as declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers." *Id.* "[T]est scores and advancement in class grade can be seen as supporting that educational benefits are being received" as long as those scores and advancements "arise from compliance [with] and not deviation from the IEP." *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 590 (5th Cir. 2009).

Here, the evidence indicates that L.G.'s IEP did produce educational benefit. First, as discussed previously, L.G. participated in her science and social-studies classes, earned passing grades in those classes and, therefore, received academic benefit in those classes. Additionally, L.G.'s STAR reading test shows that her reading has progressed. Specifically, she progressed from late-emergent reader in January 2018 to a transitional reader in May 2018 and now has the skills to work on becoming a fluent reader. *See* Dkt. No. 31-2 at 12–13; Dkt. No. 31-4 at 106; Dkt. No. 31-5 at 188–89. L.G. has also progressed in her speech. Dkt. No. 31-5 at 144–45, 150. In fact, her articulation skills have improved, and she has progressed to being 95% intelligible in conversational speech. *Id.* at 150. Moreover, L.G. has progressed to a point where she knows most of the alphabet, Dkt. No. 31-6 at 30, can count from one to seven, *id.* at 28, can add when manipulatives or picture objects are given to her, *id.* at 29, and can write her first and last name independently without copying, *id.* at 33. Finally, Sweetwater's reports of L.G.'s progress toward IEP goals indicate that L.G. did

in fact make progress toward meeting her IEP goals.  *See* Dkt. No. 31-3 at 68–81; Dkt. No. 31-5 at 10–19.

The plaintiffs argue that L.G. has not received any academic benefit, but they fail to meet their burden of showing that L.G. actually did not progress or that any progress was de minimus.  The plaintiffs' argument rests on three assertions: (1) she received no academic benefit in her mainstreamed science classes; (2) she made no more than de minimus progress in reading; and (3) L.G. was not making appropriate progress given her unique abilities.  *See* Dkt. No. 33 at 50–53.  Even if these arguments were factually correct, they do not justify a finding that L.G. had no academic progress.  The plaintiffs challenge progress in science, social studies, and reading, but they do not challenge progress in writing, reciting the alphabet, and math—specifically counting to seven and being able to add when given manipulatives or picture objects.  *See id.*  But "it is not necessary for [a student] to improve in every area to obtain an educational benefit from his IEP."  *Bobby R.*, 200 F.3d at 350.  Therefore, even if the plaintiffs could show that L.G. made de minimus progress in science, social studies, and reading, they must still show de minimus progress in all other subjects to show a lack of academic benefit.  This they cannot do given L.G.'s progress.

Additionally, the plaintiffs fail to carry their burden of proving each of their bases for their assertion that L.G. did not receive academic benefit.  With respect to the plaintiffs' assertion that L.G. did not receive academic benefit in her mainstreamed science and social-studies classes, as discussed previously, the evidence indicates otherwise.

Though some data indicates a lack of progress in reading, the plaintiffs fail to support that the data indicating lack of progress is more reliable than the data indicating progress.  To support their assertion that L.G.'s reading progress was de minimus at best, the plaintiffs

argue that the STAR results show de minimus progress, that Istation data indicates a lack of progress, and that L.G. is three years behind in reading.  Dkt. No. 33 at 50–51.  As to the STAR testing, the plaintiffs fail to provide any factual support for their assertion that L.G.'s improvement in her STAR testing indicates de minimus progress.  *Id.*  When discussing the Istation data, the plaintiffs do correctly assert that the Istation data showed no improvement.  *See* Dkt. No. 9-5 at 84, 86.  The plaintiffs also assert that the Istation data reflects L.G.'s abilities more accurately than STAR data, but the part of the record that they cite to support this assertion does not support it.  *See* Dkt. No. 33 at 51; Dkt. No. 9-7 at 327.  And testimony admitted at the due-process hearing indicates the opposite—that STAR data is more reliable than Istation data.  Dkt. No. 31-5 at 188–89.  Finally, the plaintiffs try to argue that L.G. received no academic benefit in reading because she was reading three years behind her level, but this argument is irrelevant because the Fifth Circuit has directed courts not to measure development by a student's relation to the rest of the class.  *See Bobby R.*, 200 F.3d at 349.  Therefore, the plaintiffs have failed to show that L.G. made only de minimus progress in reading.

As to their final argument that L.G. did not receive educational benefit—that L.G. did not make appropriate progress given her unique abilities—the plaintiffs fail to provide factual support for their allegation.  The report that the plaintiffs cite does not support this assertion.  *See* Dkt. No. 33 at 51; Dkt. No. 9-2 at 286.  Because the plaintiffs' arguments that L.G. did not receive educational benefit fail both legally and factually, the Court finds that the plaintiffs fail to show that L.G. did not receive educational benefit from her IEP.

The evidence also indicates that L.G. received non-academic benefits from her IEP.  L.G.'s IEP included a functional goal that, "when provided with adult assistance and

redirection, she would follow 2 and 3 step directions that involved a short related sequence of actions 4 out of 5 successful attempts." Dkt. No. 31-2 at 35. L.G. mastered this goal. *Id.* Also, as discussed in Section 3(B)(i)(b)(2), L.G.'s placement with her peers in mainstreamed science and social-studies allowed her to receive the non-academic benefit of being able to interact with her peers. L.G.'s mainstreamed placement also provided a type of speech therapy—interaction with their normal-functioning language models. Dkt. No. 31-5 at 146. The plaintiffs' only argument in opposition is that L.G. suffered from bullying. But as discussed previously, the evidence does not support that L.G. was bullied in her mainstreamed classes, and as discussed in the next section, the evidence does not support that there was a history of L.G. being bullied or that Sweetwater failed to adequately react to any allegations of L.G. being bullied. Additionally, even if L.G. was bullied, this argument does not refute the evidence that she mastered the functional goal in her IEP unrelated to improving her social skills and learning to interact with her peers. Therefore, the Court finds that L.G.'s program produced positive non-academic benefits in addition to academic benefits and, therefore, that this factor weighs in favor of finding that Sweetwater developed an appropriate IEP for L.G.

Because all four factors that guide the Court's analysis of L.G.'s IEP weigh in favor of finding that Sweetwater developed an appropriate IEP for L.G., the Court finds that L.G.'s IEP was reasonably calculated to enable her to receive educational benefits.

### ii. Sweetwater did not deny L.G. a FAPE by failing to respond to allegations of bullying.

The evidence indicates that Sweetwater did not fail to respond to allegations of bullying. In fact, Peggy Elliott, the principal of Southeast Elementary—where L.G. attended kindergarten and first grade—testified at the due-process hearing that L.G. had not

been bullied at her school.  Dkt. No. 9-8 at 339.  Elliott further testified that neither L.G., nor her parents, ever reported bullying to her.  *Id.*  Additionally, Jimmy Bennett, the principal at East Ridge Elementary—the school that L.G. attended for second grade— testified that he had received no reports that L.G. had been bullied and that the only incident that she had been involved in that could be construed as bullying occurred within two weeks of the due-process hearing.  *Id.* at 230–31.

L.G. was involved in a few incidents, which did not involve bullying at school, and Sweetwater appropriately dealt with the only known bullying incident involving L.G.  Elliott did concede that L.G. was involved in two incidents at her school, but neither of those incidents were bullying.  *See id.* at 339–41.  In one incident, one of L.G.'s classmates threw a book and hit her, but that student had no intention of hitting L.G. with the book and did not direct any malice toward L.G.  *Id.* at 339–40.  In another incident, L.G.'s mother complained that a student stole L.G.'s watch, but an investigation showed that L.G. gave her watch to a friend.  *Id.* at 340–41.  After L.G. got the watch back, a teacher took the watch away from her and gave the watch to L.G.'s grandmother pursuant to school policy because L.G. was playing with the watch in class.  *Id.* at 341.  Additionally, at Bennett's school, L.G. was hit by a classmate in her PE class, but that incident was not bullying because the student involved did not act out toward L.G. or intend to hurt her.  *Id.* 9-8 at 214–15.  Finally, at Bennett's school, within two weeks of the due-process hearing, a counselor reported that a classmate threw a ball at L.G.  *Id.* at 215.  But the student denied throwing the ball, and Bennett testified at the due-process hearing that he dealt with the situation by telling the classmate that he would not tolerate any more incidents and telling L.G. to report any such incident.  *Id.* at 216.  All of this evidence together indicates that

L.G. suffered from minimal if any bullying and that Sweetwater appropriately responded to the one possible bullying incident.

To support their position, the plaintiffs first cite L.G.'s mother's testimony that L.G. was bullied in 2014, but her mother admits that the school took care of that incident after she reported it. *Id.* at 7–9. The plaintiffs also cite L.G.'s mother's testimony that the book, watch, hitting, and ball incident were bullying. *Id.* at 10–12. But considering that the mother did not personally observe these events, the Court finds that, when viewed alongside the testimony of the school officials who observed and investigated the incidents, the mother's testimony does not independently show by a preponderance of the evidence that these incidents involved bullying. Further, the plaintiffs fail to present evidence that Sweetwater did not appropriately address the incidents, even if they were bullying. In fact, the evidence cited by the plaintiffs indicates that Sweetwater had a set of bullying procedures in place. Dkt. No. 9-7 at 171.

Finally, the plaintiffs cite L.G.'s mother's testimony that L.G. was verbally abused by her peers. Dkt. No. 9-8 at 12, 48. But there are no reports that classmates verbally abused L.G.—either from school officials or L.G. parents—and Elliott and Bennet both testified that they did not observe verbal abuse. *Id.* at 213–14, 339. Because Elliott and Bennet actually observed L.G. at school, and the mother did not report bullying at the time that it allegedly occurred, the Court finds that, by itself, L.G.'s mother's testimony of verbal abuse does not show by a preponderance of the evidence that such bullying occurred. Additionally, Bennett's testimony that he learned about one bullying incident for the first time in the due-process hearing complaint and that L.G.'s mother admitted to him that she had not reported at least one bullying incident to the school, *id.* at 219, further confirms this

finding.  Moreover, the plaintiffs fail to provide evidence that Sweetwater knew about such verbal abuse.  Because the plaintiffs fail to meet their burden of showing that L.G. was bullied and that Sweetwater failed to appropriately deal with the bullying, the Court rejects the argument.

The plaintiffs also argue that Sweetwater failed to deal with bullying appropriately because it failed to address bullying at an ARDC meeting even though it was on the agenda as a topic.  Dkt. No. 35 at 18.  Though the record of the meeting indicates that bullying was not addressed, *see id.* at 20–22, the evidence does not indicate that Sweetwater deliberately chose not to address bullying.  In fact, Sweetwater's meeting agenda states that the bullying topic was added at the request of the parents.  *Id.* at 23.  At the meeting, Sweetwater allowed the parents to discuss their concerns, including bullying, but the parents chose to discuss science and social studies instead.  *See id.* at 21.  And the plaintiffs do not allege that there were any specific acts of bullying that Sweetwater knew about and needed to address at the meeting.  *See* Dkt. No. 35 at 18.  Therefore, the plaintiffs have failed to show that Sweetwater specifically chose not to address bullying at the ARDC meeting and that Sweetwater failed to appropriately address bullying when it did not discuss the topic.  Because the plaintiffs have not met their burden of showing that Sweetwater failed to appropriately address bullying, the Court finds that Sweetwater did not deny L.G. a FAPE by failing to respond to allegations of bullying.  *See Renee J. as Next Friend of C.J. v. Hous. Indep. Sch. Dist.*, 913 F.3d 523, 532 (5th Cir. 2019) (rejecting a claim of denial of a FAPE for

failure to respond to bullying where the school district acted reasonably to reports of

bullying).[14]

### C.   The Court finds that the SEHO correctly determined that the plaintiffs were not entitled to relief.

Because the plaintiffs have failed to show that the SEHO abused her discretion by

declining to admit the report and testimony of the plaintiffs' expert witness and to prove, by

a preponderance of the evidence, that Sweetwater denied her a FAPE, the Court finds that

no relief is appropriate.  Accordingly, the Court finds that the SEHO correctly determined

that relief is not appropriate and that the plaintiffs were not entitled to relief.

## 4.   Conclusion

Upon review of the applicable law and the evidence, the Court finds that the SEHO

did not commit error when she excluded the report and testimony of the plaintiffs' expert,

found that Sweetwater did not deny L.G. a FAPE, and denied the plaintiffs' requests for

relief.  Concluding that the Texas Rules of Civil Procedure apply to due-process hearings in

front of the TEA and that the plaintiffs violated the rules by failing to disclose the identity of

their expert or the expert's report until six days before trial, the Court finds that the SEHO

did not abuse her discretion by excluding the expert testimony and report.  Additionally, the

plaintiffs have failed to meet their burden of showing, by a preponderance of the evidence,

that Sweetwater procedurally or substantively denied L.G. a FAPE, the Court finds that the

SEHO did not err when she found that Sweetwater did not deny L.G. a FAPE.  Thus, the

SEHO did not err when she denied the plaintiffs' requests for relief.  Accordingly, the Court

---

[14] Sweetwater argues that in the Fifth Circuit, a failure to respond to bullying can result in a denial of a FAPE.  Dkt. No. 39 at 8.  Because the Court finds that the plaintiffs have failed to show that Sweetwater failed to appropriately address reports of bullying, it need not resolve the question of whether a failure to respond to bullying can result in a denial of a FAPE.

grants Sweetwater's Motion for Summary Judgment, Dkt. No. 23, and denies the plaintiffs'

Amended Motion for Summary Judgment, Dkt. No. 32.  Finally, the Court denies the

plaintiffs' original Motion for Summary Judgment, Dkt. No. 26, as moot.

So ordered on July 26, 2021.


_____

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

## GLOSSARY

| ARDC | Admissions, Review, and Dismissal Committee |
|------|---------------------------------------------|
| FAPE | Free Appropriate Public Education |
| FBA | Functional Behavioral Assessments |
| FIE | Full Individual Evaluation |
| IDEA | Individuals with Disabilities Education Act |
| IEE | Independent Educational Evaluation |
| IEP | Individualized Education Plan |
| OT | Occupational Therapy |
| PLAAFP | Present Levels of Academic Achievement and Functional Performance |
| PWN | Prior Written Notice |
| SEHO | Special Education Hearing Officer |
| TEA | Texas Education Agency |